## THE SCHOOLS *v.* RISLEY.

1. Calls for the Mississippi River in deeds or conveyances from one private individual to another private individual for lots in St. Louis do not give or create riparian rights in the grantees.

2. The eastern boundary of the corporation of St. Louis of 1809, and the eastern line of the out-boundary of December 8, 1840, both extend to the middle of the main channel of the Mississippi River.

3. A street or tow-path or passway or other open space permanently established for public use between the river and the most eastern row of lots or blocks in the former town of St. Louis, when it was first laid out, or established, or founded, would prevent the owners of such lots or blocks from being riparian proprietors of the land between such lots or blocks and the river. But this would not be true of a passage-way or tow-path kept up at the risk and charge of the proprietors of the lots, and following the changes of the river as it receded or encroached, and if the inclosure of the proprietor was advanced or set in with such recession or encroachment.

4. The act of June 13, 1812, reserving certain lands for the benefit of the public schools of St. Louis, does not reserve lands made by accretion to lots on the river which were inhabited, cultivated, and possessed by persons at the time of the cession of December, 1803, and till the already mentioned act of June 13, 1812.

5. A concession which would have effect to bind a person when claiming under it and when it relates to one piece of property, has no effect when the person does not claim under it and when it relates to another.

6. Where the instructions given to the jury are sufficient to present the whole controversy to their consideration, and they are framed in clear and unambiguous terms, it is no cause for the reversal of a judgment to show that one or more of the prayers for instruction presented by the losing party and not given by the court were correct in the abstract.

7. The map known as Chouteau's map in the office of the record of land titles at St. Louis is not evidence conclusive upon questions of the extent of lots in that town. But it may go to a jury with other evidence.

ERROR to the Supreme Court of the State of Missouri, the case being this:

The city of St. Louis, as is known, is situated on the west side of the Mississippi River and faces the stream. It was formed by the French and Spanish in times as early as 1764; and passed to the sovereignty of the United States by the cession which France made December 20, 1803, of the large region then known as the province of Louisiana. French subjects being already in possession of various rights throughout the town, Congress by statute of 1812 enacted that "the rights, titles and claims to those town or village lots, out-lots, common field lots and commons, in, adjoining, and belonging to the towns which had been inhabited, cultivated or possessed, prior to the 20th of December, 1803, should be, and the same were thereby, confirmed to the inhabitants of the town according to their several right or rights in common thereto." The act proceeds, in its first section:

"And it shall be the duty of the principal deputy surveyor of the said territory to survey the out-boundary lines of the said town, so as to include the out-lots, common field lots and commons thereto belonging. And he shall make out plats of the surveys, which he shall transmit to the surveyor-general, who shall forward copies of the said plats to the commissioner of the General Land Office and to the recorder of land titles. The expense *of surveying the said out-boundary* lines shall be paid by the United States."

The second section of the act provided that " all town lots, out-lots or common field lots *included in such surveys,* which were not rightfully owned, or claimed by any private individuals, or held as commons belonging to such towns and villages, . . . should be reserved for the support of schools."

In 1803, and indeed till the year 1844, there was a street running nearly parallel to the Mississippi River and within less than two hundred feet of it (the river rather eating into the bank, year by year), known as Second Street, or some-

times (in its extension), Prairie-à-Catalan or Carondelet. On the east side of this street, a block of ground, No. 44, ran eastward—ran, therefore, *towards* the river or *to* it; but whether "towards" only or "to" was a matter of dispute. On the north side of this block, for many years prior to the cession of 1803, one Madame Charleville had been settled, inhabiting and cultivating it; and on the south side, a free negro, named Charles Leveille.

In 1844, an extraordinary flood in the Mississippi River brought down such an immense quantity of sand that the river edge, which had previously, as above said (though apparently with some irregularities herein), kept itself within less than 200 feet of Second Street, now was left 600 or 700 feet away from it. The diagram will illustrate sufficiently the facts:

The result was that the city caused to be extended down to the new edge of the river those streets (Hazel and Lombard) which, running at right angles to the old stream, formerly met it at their extremity; and it made a new street

(New Main Street) parallel to old Second Street. The idea will be better understood from a diagram :

A new block (No. 856) was thus formed out of the alluvion, immediately in front of old 44, the block formerly occupied by Madame Charleville and Leveille. To whom did this new block belong?

That was the question in this case. And as the riparian owner, whoever he might be, took the accretions, the answer depended obviously enough on the fact whether the old block (No. 44) had run down to the river or whether it had stopped short of the river, leaving a strip not owned by any private person, and which, therefore, either belonged to the city itself or else was property of the United States, and under the act of 1812, was reserved for the public schools.

In this state of facts the directors of the public schools of St. Louis brought ejectment, in one of the State courts, against a certain Risley, who had succeeded to the rights of Madame Charleville, and also against Fritz, who had succeeded to the rights of Leveille, to recover the block. The former case (No. 27 on the docket) is here reported; it being understood that the latter case (No. 28) should follow any decision given in the other.

THE PLAINTIFF, relying on the act of 1812, introduced a

large amount of documentary evidence, and among other concessions one to a certain Louis Ride, and a confirmation of it, with a survey of the same by the surveyor-general. According to this survey, the claim was located in the north-west corner of block No. 44 and extended eastwardly no further than 150 feet. He introduced also several plots of the town, among them especially one known as Chouteau's map, with the opinion of the Supreme Court of Missouri given in the case of *St. Louis Public Schools* v. *Erskine.** In that case, where apparently objection had been made to the reception of the map at all, the court said:

" The first question that arises in this case is the propriety of the action of the Land Court in admitting in evidence the plat of the town of St. Louis, placed in the office of the record of land titles by Auguste Chouteau in the year 1825. The plat was made in 1764, about the period that the village of St. Louis was founded. Chouteau is reputed as one of the founders of the village. The recorder of land titles, who had been in the office since 1837, testified that it was a public paper and as such had been inventoried. Auguste Chouteau has been dead many years. Mr. Geyer testified that he had seen the plot in the recorder's office several times; that this map was produced in a case he tried for the schools twenty-four or twenty-five years ago.

" When we consider that in matters of public concern, tra-ditionary evidence is admissible as to boundaries, we are at a loss to conceive the ground on which the objection to the evidence is based. Chouteau was not the owner of the land on which the village was laid out, nor does it appear that he had any previous authority to do the act. But his conduct and that of his colleagues, in laying off the town, was sanctioned and adopted by the Spanish government. For many years the map has been placed in the public office where all the papers and documents relating to the early land titles in this territory were deposited. It has been exposed to the examination and scrutiny of all, so that its errors might have been detected. The map was made at a time and in a manner which show that its execution could not have been prompted by any sinister motive.

* 31 Missouri, 112, 113.

" We know that it has frequently been in use in this court, to show the plans and extent of the ancient village as originally laid out by its founders. For such purposes, when all the circumstances attending this map are considered, it is not easy to conceive more satisfactory evidence of facts of so ancient a date. If authority is wanted, in support of this view of the subject, it may be found in the cases of *Morris* v. *The Lessees of Harmer's Heirs* (7 Peters, 560), and *The Commonwealth* v. *Alburger* (1 Wharton, 469)."

Chouteau's plat represented the place thus; leaving a broad strip between block No. 44 and the river:

THE DEFENDANT, on the other hand, introduced a concession by the Spanish governor, dated March 1, 1788, to the negro Leveille, for a lot in St. Louis of 60 by 150 feet,

described in the concession as bounded on the one side by the heirs of Louis Ride, on the other by his Majesty's domain; *on the rear by the Mississippi*, and on the main front by the road which follows from the second main street to the Prairie-à-Catalan.

He also introduced a concession by Governor Manuel Perez to Augustin Amiot, dated September 2, 1788, of a lot in the southern part of St. Louis, described in the concession as " 120 feet front by 150 feet deep, bounded on the north side by the lot of the free negro called Charles, on the other side by the royal domain, *on the rear by the Mississippi*, and on its principal front by the royal road leading to the Prairie-à-Catalan."

BOTH PARTIES introduced parol evidence tending to show :

*On the defendant's side*, that in Spanish times the lots ran to the river; that there was never any street between the east end of the lots and the river; that the ends of the fence would sometimes have to be moved back on account of the abrasion or falling in of the river bank; that the river, for some years prior to 1844, occasionally slightly receded from the east bank, in low water, but that in consequence of high water in 1844, and of accumulations caused by the materials used in constructing cross streets out in the river, the ground afterwards increased rapidly eastwardly.

*On the plaintiff's side* the parol evidence tended to prove that there was always a path or road between the lots and the river, in Spanish times, and that the road extended the whole length of the town; that the government always left a strip of land along the river for voyagers, but that the road along the river was repaired by the voluntary act of the people living along the road and not by public authority or public taxes.

THE DEFENDANT gave in evidence a resolution of the board of aldermen of the city of St. Louis, authorizing a survey and map of the city, and a lithographic copy of a map known as Paul's map of 1823, which was proved to be a true copy of the original made under such resolution. It was admitted that the field-notes of the survey and the original map were

lost. From this map it appeared that the main street extended at the date of the map no further south than Plum Street, and that the river covered all the eastern part of Block 44. The defendant then introduced the ordinance of

the city, passed in 1851, opening Main Street south of Plum and through Block 44, and proved that defendant, in con-

formity with the ordinance, relinquished the right of way; also a tax sale of the lot of Leveille for the city taxes of the year 1820. The certificate of sale of the assessment describe the lot as bounded east by the river.

The defendant also showed in evidence the tax receipts for his real property for the years 1837, 1838, 1839, 1845, 1846, 1847, 1848, 1849, 1853, 1854, 1855, 1856, 1857. From these receipts, it appeared that up to 1853 the defendant was taxed for a lot in Block 44, as bounded *on the east by the river.* The depth of the lot was described as increasing from 150 feet in 1837 to 800 feet in 1854. In 1854 and following years the defendant was taxed for the property in dispute as lying between Main and Front Streets. The defendant also showed that he had been assessed by the city, and had paid in 1854 a tax on the property in question for opening streets, and then introduced a map of Risley's Addition, recorded in 1855.

The defendant then introduced one Marshall as a witness, who testified that he was an examiner of titles to lands; that he had examined almost all titles to lands in the city of St. Louis, and he gave it as his conclusion, that the land of Ride was north of Elm Street, that is to say, was nowhere in the neighborhood of Madame Charleville's lot, but was in fact in a different and distant part of the city. He also read in evidence a deed of Tayon to Papin in 1832, in which the lot was described as bounded eastwardly by the Mississippi River, or street if any there be; also the deed of Papin to Stearne and Risley, containing the same boundaries; also the deed of Stearne to Risley in 1836, with the same boundaries.

There was much other testimony on both sides, but that above stated constituted the controlling parts, and the residue was merely auxiliary or cumulative.

Upon this case the plaintiff's counsel asked the court to give fourteen instructions, the purpose of which, in the general, and so far as insisted on here, was to charge the jury as to the effect in law of the evidence; and that the plan of the town by Chouteau should be taken as a conclusive

muniment of title.*   The court gave none of these instructions.   But it did instruct the jury in effect,

FOR THE PLAINTIFF:

1. That calls for the river, in the deeds or conveyances read in evidence, from one private individual to another, did not give or create riparian rights.

2. That the eastern boundary of the corporation of St. Louis of 1809, and the eastern line of the out-boundary of December, 1840, both extended to the eastern boundary of Missouri, which is the middle of the river.

3. That if the jury believed that a street, tow-path, or passage-way, or other open space, was permanently established, for the public use, between the river and the most eastern row of blocks (of which 44 was one) when the town was founded and laid out, then that the owners of that block were not riparian proprietors of the land between the block and the river.

FOR THE DEFENDANT:

1. That if the jury believed that the original claimant, prior to the cession, inhabited, cultivated, and possessed the land described in the petition, claiming title to the same, and that she and those claiming title under her continued to inhabit, cultivate, and possess the premises to the passage of the act of 1812, and that the land in controversy is a part of the accretions made to that lot along the eastern line extending to the river in its present position, then that the verdict must be for the defendant.

2. That the evidence that a passage-way or tow-path existed along the river bank would not affect the rights of the parties if the jury found that the same was kept up at the charge and risk of the proprietor of the lot, and that it followed the changes of the river, going to the east or west as the river receded from or encroached upon the lot, and that

---

* The reader interested specially in the case, can see these fourteen instructions in the report of the case below, 40 Missouri, 358.

the inclosure of the proprietor was advanced or set back with such changes.

3. That the claim confirmed to Louis Ride could not affect the rights of the parties, if the jury found that the claim was located on a different block from that of Madame Charleville.

The jury found for the defendants, and judgment having been entered accordingly and afterwards affirmed in the Supreme Court of Missouri, the case was brought here under the 25th section of the Judiciary Act.

*Messrs. M. Blair and F. A. Dick, for the plaintiff in error:*

The court refused to instruct the jury for the plaintiff as to the effect of evidence, but left the case to the jury on their construction of it. It refused to give any effect in law to the plan of the town made by Chouteau, and to the confirmations and surveys by the United States of the lot in question, fixing the extent and boundaries of the lot, and treated the case as one to be left exclusively to the opinion of the jury on the weight of the parol evidence against the documentary evidence. In fact, the court left the jury to treat testimony of witnesses as of more effect than all the documentary proof offered by the plaintiff; and, indeed, allowed the record title of the plaintiffs to be overturned by oral testimony which did not conflict with it.

Now it is matter of common knowledge that there is, in the public archives, in the recorder's office and surveyor-general's office, in St. Louis, and in the land office here, full evidence of the establishment of St. Louis as a Spanish town, with streets and blocks, public places, and lots used for cultivation, called common field lots, and town lots, and barn lots. There were public authorities, who regulated streets, commons, bridges, and all general matters.*

What had been public property when the town plan of Chouteau was settled upon in 1764 for the common use of the town, descended to the public when the country was ceded in 1803; and even though in 1812 the land which

---

* See Mackay *v.* Dillon, 4 Howard, 430; Strother *v.* Lucas, 12 Peters, 412.

embraced the lot in controversy was under water, yet, if by the plan of the town there was a margin of public ground in front of this block, and this block had by such plan an actual boundary on a line in common with the blocks further north, then such public plan must control the private property, and such public space is the actual limit of the blocks and the lots composing them.

If there ever was a vacant public space reserved for common use as a landing or street by the public plat in front of these lots, such as marked on Chouteau's map, the public title would not pass to private lot-owners, even though the encroachments of the river might wear away that part of the soil above water. The river bottom within such lines would remain still subject to the same title. Now, Chouteau's map is an ancient document which establishes the line of this Block 44 in the relative position that it occupied in 1764 with reference to the blocks north of it, and we thus can certainly fix the precise line of the front of Block 44 as indicated on Chouteau's map, and as it was in 1764. The blocks to the north, remaining as they were in 1764, and giving a uniform and permanent front line to the old town where they lie, thus serve to fix the precise position of such front line of Block 44. Now the block there in 1764 had a front line not touching the river, and there was this same public wharf that then and still exists to the north, extending along the entire front of the town. It was by Chouteau's map actual ground above the surface of the water. This was public property, established by a title-paper of *conclusive effect*, if admissible at all.

The question, then, of controlling importance is, whether Chouteau's map and the other documentary evidence was evidence of what was the plan of the town, showing the blocks, streets, and lines of public and private property.

This depends upon the construction of the act of 1812. This act required the United States surveyor " to survey the out-boundary lines of said towns so as to include the out lots, common field lots, and commons; " and he was directed to make out plats of the surveys, and transmit the

same to the commissioner of the General Land Office and recorder of land titles. The expense "*of surveying the said out-boundary lines* shall be paid by the United States."

Section 2d says that all town lots "*included in such surveys*, which are not rightfully owned by private individuals, are reserved for the support of schools."

This act is in all its provisions binding upon individual owners, and they must take their titles subject to the survey it calls for; what it reserved to the United States was, and continued to be, public land, and the surveys it required became, when made, muniments of title.*

By the construction of the act of 1812 given by the defendant, a public survey of a reservation which the President might have chosen to make out of the public lands of St. Louis, would not prevail over verbal proof of title such as is offered here. This is contrary to the whole current of decisions of this court respecting surveys of grants of land made under the laws providing for such grants.†

A grant of title, that Congress reserved the power to locate by survey, and promises to so locate, is not available as a title, if the very same act be interpreted to mean that such location, when made, may, at any length of time, be overthrown by parol evidence. This places the plaintiff's title at the mercy of a single witness; for the act of Congress provides for no other evidence of title in the plaintiff; and we see the effect of this construction of the law in practice when a jury decides in support of the views of the court below, against the survey, on the recollection, perhaps, of one single witness, testifying to what years before he thought as to the description of the premises.

The possibility that a regular survey and assignment, of the validity and effect given to this by this court in Kissell's case,‡ can be overthrown by the recollections of a child as to a matter that perhaps he had the slightest means of observ-

* Kissell v. Public Schools, 18 Howard, 21.

† West v. Cochran, 16 Howard, 403; Willot v. Sandford, 19 Id. 79; Carondelet v. St. Louis, 1 Black, 179; Menard v. Massey, 8 Howard, 313.

‡ *Supra.*

ing, and not become material until he was perhaps eighty years of age, shows·a construction of this act by the court below contrary to good sense, to security of titles, and to the current of decisions of this court.

. The surveyor-general, under the act of 1812, was charged with a duty that he then could readily and accurately perform, and this was to. gather together all the archives and documents which had been before the boards of commissioners, and were recorded in the recorder of land title's office, and determine where the different kinds of property were located. The Spanish concessions were open to him, Chouteau's map, and all that could furnish him with information; and also innumerable intelligent witnesses, including the large landowners, the proprietors of large tracts of . land, the members of the boards of commissioners, who had investigated officially all these public facts. In the light of all these investigations, Chouteau's plat was filed in the recorder's office, and no error in it has ever been pointed out. It is from such material as all this that the assignment to the schools is made up. On this material the surveyor-general was made a special judge, and it was for him to. ascertain and decide what was public land and what not, and in *Kissell* v. *Schools*,\* this court say : " We are of opinion that the certificate of the surveyor-general . . . is *record evidence of title*," &c.

It could have been consistent only with the rulings of this court to have declared that this survey was authoritative and *conclusive* against another title under the same act, not sustained by a survey.

The defendants, to avoid this result,. attempt to prove another plan of the town,† by showing that the street along the rear of their lots shifted east and west as the river receded or encroached. But the little passage-way spoken of by the witnesses was not the public space marked on Chouteau's map. The court below made the decisive question of fact the nature of this little pass-way as it was within the

---

\* 18 Howard, 25.        † Paul's map of 1823; *supra*, p. 98.

knowledge of the witnesses. · But this was turning attention to a small and almost immaterial matter, and excluding the public space shown by Chouteau's map, which established the character of the land, from the jury.

The *vivâ voce* testimony of old witnesses proved nothing contradictory of the map and record offered by us, but only the fact within their recollection, which was nearly, if not altogether, after 1803, that the land above water did not reach as far east as the east line of Block 44. If, therefore, the jury believed the testimony of these witnesses, they would find for the defendant, notwithstanding they might believe that, far east of the water-line, on the plan first established for the town, there was a public wharf reserved permanently for public use.

There was a direct and irreconcilable contradiction between the instructions given for plaintiff and defendant. An instruction declaring on the proof that, as a matter of law, the lots did not rightfully extend across this public wharf, under the act of 1812, ought to have been given.

*Mr. J. J. Gantt, contra :*

If the fact that the river was the boundary of the lot in 1803, carried the owner of it to the *medium filum aquæ*, the lot, up to the middle thread of the stream, was confirmed by the first section of the act of 1812. This was the whole matter in dispute in this cause. And the case lies within ordinary and narrow limits. The instructions given were proper on this question.

The plaintiff assumes that the authorities of the Spanish government had a fixed and ascertained plan for laying off the town of St. Louis in 1764, and that this plan was not only immutable, but that a paper called "Chouteau's map," which was first filed in the office of the recorder of land titles, in St. Louis, in 1825, was the authentic, exclusive, and infallible evidence of this scheme. These assumptions are unwarranted. If we accept Chouteau's map as the scheme or plan for laying off the town of St. Louis, which *he* recommended to the authorities in 1764 (we have no sort

of authority for assuming that he ever did this), nothing is plainer than that one of two things must be true: either Chouteau did not, in making this sketch, go upon the ground and ascertain carefully whether natural obstacles interfered with the plan sketched in his diagram; or else he attempts to make these natural obstacles bend to his theory of what the town should be. Chouteau was not proprietor of the land to be covered by the town, nor an officer of the crown of Spain, in 1764, when this plan is supposed to have been made. We see plainly that the Spanish governor did not pay any attention to this plan. Either he never heard of it, or, knowing of it, he treated it as worthy of no heed; for the grant to Leveille, the grant to Amiot, and the possession of many others, permitted by the authorities, were inconsistent with Chouteau's plat. The refused instructions declared that the presumption of fact was that the Spanish government sanctioned a particular plan of St. Louis; whereas, the only evidence we have on the subject proves clearly that all the limitations of the supposed scheme were disregarded by the Spanish government. Chouteau's map was deposited by Chouteau, in 1825, in the recorder's office. There is no certificate upon it by him. Its character, whatever it was, must have rested upon Chouteau's parol statement, without any sanction of either an oath or official duty. We do not know what his statement, if any, was. But whatever it was, it could be no more than a mere statement, which is admitted as tradition. If the instructions refused should have been given, it would follow, among other things, that the general plan of a town may be proved by parol, but that particular deviations from that plan cannot be proved by parol.

The whole instructions given are consistent, and were the right ones.

Mr. Justice CLIFFORD delivered the opinion of the court.

Possession of the colony or province of Louisiana, ceded by France to the United States under the treaty of cession

of the thirtieth of April, 1803, was formally delivered to the United States on the twentieth of December of that year; and on the thirteenth of June, 1812, Congress passed the act making further provision for settling the claims to land in the Territory of Missouri, the first section of which provides to the effect that the rights, titles and claims to town or village lots, out-lots, common field lots and commons in, adjoining and belonging to the several towns or villages therein named, including St. Louis, in that Territory, " and which have been inhabited, cultivated, or possessed" prior to the date of that formal delivery, " shall be and the same are hereby confirmed to the inhabitants of the respective towns or villages aforesaid, according to their several right or rights in common thereto."*

Lands confirmed by the board of commissioners were not included in that section, and the further provision is that the principal deputy surveyor of the Territory shall survey or cause to be surveyed and marked, where the same has not been legally done, the out-boundary lines of the said towns or villages, so as to include the out-lots, common field lots, and commons thereto respectively belonging.

Provision having been made in the first section for such surveys, the second section provides that all town or village lots, out-lots, or common field lots included in such surveys, which are not rightfully owned or claimed by private individuals or held as commons belonging to such towns or villages, or selected by the President for military purposes, " shall be and the same are hereby reserved for the support of schools in the respective towns or villages aforesaid," not to exceed, however, one-twentieth part of the whole lands included in such general survey.

Part of block numbered eight hundred and fifty-six, situated in the city of St. Louis, is claimed by the plaintiffs in this case under the second section of that act, as appears in the description of the tract set forth in the petition, which is in the nature of an action of ejectment to recover posses-

---

* 2 Stat. at Large, 748.

sion of the premises.    Process was duly issued and served, and the defendant appeared and filed an answer in which he denied. that the plaintiffs, at the commencement of the suit, were entitled to the immediate possession of the same, and he also denied that he, the defendant, did, at the time mentioned, unlawfully withhold from the plaintiffs the pos-session thereof as alleged in the petition.

Application for change of venue was subsequently made by the plaintiffs, and the cause, in pursuance of such application, was transferred into the St. Louis Circuit Court, where the parties went to trial, and the verdict and judgment were for the defendant, and the plaintiffs excepted and removed the cause into the Supreme Court of the State.

Subsequent to the removal of the cause into the Supreme Court the defendant deceased and his legal representatives became parties to the suit, and after hearing, the judgment of the Circuit Court of the State was in all things affirmed, and the plaintiffs sued out a writ of error under the twenty-fifth section of the Judiciary Act, and removed the cause into this court.

By the bill of exceptions it appears that the plaintiffs in the trial before the jury in the Circuit Court of the State introduced the following evidences of title in support of their claim to the immediate possession of the premises: (1) A copy of the ordinance dated November 9, 1809, incorporating the town of St. Louis.    (2) Survey and plat of the boundary of the town, which purport to have been made in conformity to the requirements of the first section of the before-mentioned act of Congress.    (3) School assignment numbered four hundred, and dated December 10, 1855, as more fully set forth in the transcript.    (4) An act of the State legislature, approved November 23, 1857, which it is agreed may be read from the printed volume.    (5) Copy of the deed from the city of St. Louis to the plaintiffs relinquishing to them the land in controversy.    (6) Quit-claim deed from the plaintiffs to the city of St. Louis relinquishing their title to certain tracts therein specified.    (7) An act of the legislature of the State, approved March 3, 1851, en-

titled " An act respecting swamp lands in St. Louis County."
(8) Three acts of Congress upon the subject, to wit, the act
passed.June 13, 1812, also the act passed May 26, 1824, and
the act passed January 27, 1831, to which reference is made.*
(9) A stipulation waiving objections to certain depositions,
and. agreeing that the defendant was in the possession of the
premises at the commencement of the suit.

Separate examination of the respective evidences of title
introduced by the plaintiffs will not be necessary, for two
reasons : (1) Because the defendant concedes that the as-
signment of the land to the schools under the act of May 26,
1824, vested a good title in the plaintiffs, unless the title to
the same was confirmed by the first section of the prior act
to those under whom the defendant claims a superior title.
(2) Because the questions to be determined are presented in
the exceptions to the refusals of the court to give the instruc-
tions as requested by the plaintiffs and to the instructions
given by the court to the jury.

Both parties agree that the land in controversy adjoins
block forty-four, which belongs in part at least to the de-
fendant and is not claimed by the plaintiffs. They also
agree that prior to 1844 block forty-four was the front block
facing the river, and that the land of the entire block in
controversy has been formed since that time by alluvial de-
posits, but the theory of the plaintiffs is that block forty-
four, as originally located and marked on the plan of the
town, never extended to the river, that there was in fact a
margin of shore between that block and the river, which.
was reserved for public use as a way for voyagers or a tow-
path for persons engaged in propelling boats, and that such
way or tow-path never was a part of the block possessed
and claimed by the defendant and his associates.

Suppose the fact to be so, then it is not pretended by the
defendant that the land described in the petition was con-
firmed by the first section of the act of June 13, 1812, but.
he denies the entire theory of the plaintiffs and insists that

* 2 Stat. at Large, 748; 4 Ibid., 65, 435.

there never was any such public reservation between the block possessed and claimed by him and the river, as is supposed by the plaintiffs; that the use of the supposed margin by voyagers and other persons as a way or tow-path, if any, was permissive and by consent of the owners of the block, and that the block as laid out, inhabited, cultivated and possessed was always understood to extend to the river, and consequently that the same was confirmed by the first section of the before-mentioned act of Congress, as contended by the defendant.

Conceded, as the fact is, that the title to block forty-four was in those under whom the defendant claims, prior to the alluvial deposits which formed the land described in the petition, the principal contest in the State court was and still is as to the extent and boundaries of that block antecedent to the time when the land in controversy was formed by such alluvial deposits and accretions. Beyond doubt, block forty-four, if it was inhabited, cultivated, and possessed prior to December 20, 1803, as claimed by the defendant, was confirmed by the first section of the act of June 13, 1812; and if it extended to the river at that time it is clear that the owners thereof were riparian owners; and if so, it is equally clear that they were entitled, as such to all the accretion thereto occasioned by alluvial deposits or by the gradual recession of the waters of the river from the usual water-mark.*

On the other hand, unless that block extended to the river, as supposed by the defendant, it is certain that he has no title to the land in controversy, as those under whom he claims in that state of the case were not riparian proprietors, and the act of Congress referred to as confirming the title to that block could not and did not have the effect to enlarge its boundaries.†

Evidence, written and oral, was introduced by the defendant to show that the northern half of block forty-four

---

* Kissell *v.* The Schools, 18 Howard, 21.

† Railroad *v.* Schurmeir, 7 Wallace, 287; 3 Kent's Commentaries, 11th ed. 427.

was inhabited, cultivated, and possessed by Madame Charle-
ville and her children several years before the treaty of ces-
sion was ratified, and the witnesses testify that there was a
house and barn on the lot and other improvements, and that
it extended to the river. She and her family occupied and
cultivated the northern half of the block, and the witnesses
also testify that it was fenced in on all sides excepting the
side bordering on the river, and the evidence to that effect
is full and satisfactory. They admit, however, that there
was a passage-way on the shore or bank of the river kept
by the owner for her own convenience, where people used
to pass as on a street or alley, but they generally agree that
it was not a public way, and that it was frequently interrupted
by fences built by the owner of the premises.

Parol evidence was also introduced by the defendant, show-
ing that Charles Leveille inhabited, cultivated, and possessed
the southern half of that block prior to the ratification of
the treaty of cession, and the defendant introduced the orig-
inal concession to him of that part of the block, dated March
1, 1788, and also a translation of the same, and the proofs
show that his lot was sixty by one hundred and fifty feet, and
that it was inhabited, cultivated, and possessed by the donee
of the tract some eight years before the date of the concession.

As there described, the lot is "bounded on one side by
the land of Louis Ride, on the other by His Majesty's domain,
on the rear by the Mississippi, and on the main front by
the road which follows from the second main street to the
Prairie-à-Catalan." He also introduced a concession from
the governor to Augustin Amiot, dated September 2, 1788,
of a lot in the southern part of St. Louis, described in the
concession as follows, to wit: "120 feet front by 150 feet
deep, bounded on the north side by the lot of the free negro
called Charles, on the other side by the royal domain, on the
rear by the Mississippi, and on the principal front by the
royal road leading to the Prairie-à-Catalan." Other exhibits
were also introduced by the defendant as fully set forth in
the record, and the parties agreed that Prairie-à-Catalan
and Carondelet, as used in the record, mean the same thing.

Defendant also introduced a resolution and ordinance of the city, adopted in 1823, in relation to the survey of the city, and also a lithographic copy of the map made by the city surveyor in accordance with that ordinance; also the revised ordinances of 1843, concerning streets. Proof was also introduced by him to show that the original map was lost and that the copy was correct, and it appears that it was put in evidence to show that Main Street, at that date, extended no further south than Plum Street, and that the eastern part of block forty-four, as now claimed, was a part of the bed of the river.

By the record it also appears that the defendant introduced a tax sale of the lot occupied by the colored man, Charles Leveille, for the non-payment of the taxes for the year 1826, and the assessment shows that the lot was therein described as bounded east by the river. Tax receipts for ten or fifteen years, given for the taxes paid by the defendant, as assessed on his property, commencing in the year 1837 and ending in the year 1857, were also introduced by the defendant, and it appears that prior to the year 1853 he was taxed for a lot in block forty-four, described as bounded on the east by the river.

Rebutting evidence, written and oral, was then introduced by the plaintiffs, tending to show that there was a public passage-way or street between block forty-four and the river, and that no part of that block ever extended easterly beyond that passage-way. Chouteau's map is one of the written evidences referred to as having been introduced by the plaintiffs, and they insisted, and still insist, that their title to the land in controversy is conclusively shown by that document.

When the plaintiffs rested, the defendant was permitted to rejoin, and he introduced new evidence to show that the block as originally inhabited, cultivated, and possessed did extend to the river, and that there never was any such public passage-way or street as that described by the plaintiff's witnesses.

Both parties resting, instructions were given by the court

to the jury, first at the request of the plaintiffs, and secondly at the request of the defendant, but the finding of the jury was adverse to the plaintiffs, affirming the theory of the defendant, that there was not any such public passage-way or street between the river and block forty-four, as is supposed by the plaintiffs, and that the block referred to, as originally located, did extend to the river, as claimed by the defendant.

Five instructions presented by the plaintiffs were given by the court to the jury as requested, and three presented by the defendant were also given without any qualification, but the plaintiffs presented at the same time fourteen other prayers for instruction which were refused by the court. Reference is made to the record for the precise form of the instructions as requested and given or refused, as they fill too much space to be reproduced without abbreviation. Those given at the request of the plaintiffs are in substance and effect as follows: 1. That calls for the river, in the conveyances read in evidence, do not give or create riparian rights. 2. That the eastern boundary of the city and the eastern line of the out-boundary, as read in evidence, extended to the middle of the channel of the river. 3. That if the jury believe from the evidence that a street, tow-path, or passage-way, or other open space, was permanently established, for the public use, between the river and block forty-four when the town was founded and laid out, then, and in that case, the owner or owners of that block were not riparian proprietors of the land between that block and the river. Two other instructions were given at the request of the plaintiffs, but they are omitted as not material in this investigation, because they are the same in principle as those already reproduced.

Instructions were then given to the jury as requested by the defendant, which are in substance and effect as follows: 1. That if the jury believe from the evidence that the original claimant, prior to December 20, 1803, inhabited, cultivated, and possessed the land described in the petition, claiming title to the same, and that she and those claiming title under

her continued to inhabit, cultivate, and possess the premises to the passage of the act of June 13, 1812, and that the land in controversy is a part of the accretions made to that lot along the eastern line extending to the river in its present position, then the plaintiffs cannot recover, and the verdict must be for the defendant. 2. That the evidence that a passage-way or tow-path existed, along the river bank will not affect the rights of the parties if the jury find from the evidence that the same was kept up at the charge and risk of the proprietor of the lot, and that it followed the changes of the river, going to the east or west as the river receded from or encroached upon the lot, and that the inclosure of the proprietor was advanced or set back with such changes. 3. That the claim confirmed to Louis Ride cannot affect the rights of the parties if the jury find from the evidence that the claim was located in another and different block from that inhabited, cultivated, and possessed by Madame Charleville.

Obviously the third instruction given at the request of the plaintiffs is in substance and effect the same as the first instruction given at the request of the defendant, and it is clear that those instructions fairly presented the whole merits of the controversy to the jury as it is exhibited in the pleadings and evidence.*

No attempt is made by the plaintiffs to call in question the instructions given at their own request, nor could they be permitted to do so if the attempt was made, as such errors, if any, are to be imputed to the party making the request rather than to the court.†

They do insist, however, that the instructions given at the request of the defendant are inconsistent with those given at their request, but the court, after having carefully examined and compared the respective instructions referred to, is of the opinion that the proposition finds no support in the record.

---

* The Schools *v.* Risley et al., 40 Missouri, 365.

† Buie *v.* Buie, 2 Iredell, 87.

Where the instructions given to the jury are sufficient to present the whole controversy to their consideration, and they are framed in clear and unambiguous terms, it is no cause for the reversal of a judgment to show that one or more of the prayers for instruction presented by the losing party and not given by the court were correct in the abstract, as the refusal of the court to give the instructions as requested, under those circumstances, would not work any. injury to the party making the request, and therefore cannot be regarded as error.*

Apply that rule to the present case and it is not necessary to add another observation in respect to the prayers for instruction presented by the plaintiffs, and which were not given by the court. Certainly the instructions given, as well those given for the plaintiffs as those given for the defendant, are clear and unambiguous, and they expressly concede that the plaintiffs must recover if block forty-four was bounded on the east by a street, passage-way, or tow-path, which is all that the plaintiffs now ask, if the case is one to be submitted to the determination of a jury. They contend that Chouteau's map is conclusive in their favor, but the court is of a different opinion, and accordingly affirms the correctness of the other branch of the instructions, in which the jury were told that their verdict must be for the defendant if they found from the evidence that there was no such street, passage-way or tow-path between that block and the river, and that the river, when the town was laid out and when the act of confirmation was passed, constituted the eastern boundary of that block.†

Suffice it to say, without pursuing the argument further, that the court is of the opinion that the instructions were, in all respects, proper, and that they were clear and unambiguous, and amply sufficient to enable the jury to dispose

---

* Law v. Cross, 1 Black, 536; Hall v. Hall, 6 Gill & Johnson, 386.

† Jones v. Soulard, 24 Howard, 41; Smith v. Public Schools, 30 Missouri, 301; Le Beau v. Gaven, 37 Id. 556; Dovaston v. Payne, 2 Smith Leading Cases (6th Am. ed.), 243.

of the whole controversy as exhibited in the pleadings and evidence.*

Complaint is also made by the plaintiffs that the court erred in not regarding Chouteau's map as a muniment of title conclusive in their favor; but the court is of the opinion that the view taken of it by the State court is correct, and that it was properly regarded as evidence of title, and not as a muniment of title conclusive in itself, and that as such it was regular to submit it to the jury with the other evidence introduced by the parties. Neither party can justly complain, as the action of the court in giving the instructions was in accordance with their respective requests.

Ejectment was also brought by these plaintiffs in the same court, at the same time, against Mary Fritz, to recover possession of the southern part of the same block. Before trial the venue was changed, as in the preceding case, to the same Circuit Court, where the parties went to trial, and the verdict and judgment were for the defendant or her legal representatives. Appeal was taken by the plaintiffs to the Supreme Court of the State, and the judgment in that court was affirmed. They then removed the case into this court, where it is numbered twenty-eight on the calendar, and it was argued and submitted to the court here at the same time with the case just decided. Since that time it has been carefully examined, and it should be remarked that the facts of the case are in many respects different from the case just decided, but the differences are not of a character to affect the result in this court, and as both parties agree that the decision of the case must follow that in the preceding case, it is not thought necessary to point out those differences.

DECREE IN EACH CASE AFFIRMED.

---

* Savignac *v.* Garrison, 18 Howard, 136; New Orleans *v.* United States, 10 Peters, 662; Railroad Company *v.* Schurmeir, 7 Wallace, 287.